```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF FLORIDA
 2                    GAINESVILLE DIVISION

 3
                          CASE NO.: 1:19-cv-00038-MW-GRJ
 4
     CAPAL BEASLEY,
 5
               Plaintiff,
 6
     vs.
 7
     CENTRAL FLORIDA CONTRACTORS
 8   SERVICES, INC., a Florida for-profit
     corporation; CENTRAL FLORIDA
 9   CONTRACTORS SERVICE, LLC, a Florida
     limited liability company; and BOBBY
10   J. POWELL, JR., an individual,

11            Defendants.

12   ----------------------------------/

13                    Advantage Court Reporters
                      305 Northeast First Street
14                    Gainesville, Florida
                      Tuesday, August 20, 2019
15                    9:35 a.m.

16

17             D E P O S I T I O N

18                      of

19             CAPAL BEASLEY

20       taken on behalf of the Defendants
        Pursuant to Notice of Taking Deposition
21

22

23            REPORTED BY KAREN L. BIERY
              JOHNS, STEPHENSON & BIERY
24            ADVANTAGE COURT REPORTERS
                    352-373-7778
25
```

1      Q    So did you quit or were you terminated?

2      A    I quit.

3      Q    So you mentioned that you didn't like the

4  pay.  Any other reasons for why you quit?

5      A    I wanted more money.

6      Q    Any other reasons than that?

7      A    Yeah, we had a few issues.  You always

8  have issues, but. . .

9      Q    Tell me about those few issues.

10     A    Just the way that they ran things.  I

11 mean, I wanted more work.  For the pay that I was

12 getting, I wanted more work throughout the day

13 instead of just sitting at the shop, so. . .

14     Q    Okay.  Did you ever back into an object on

15 the job site?

16     A    Uh-huh.  (Nods head.)

17          MR. BOBER:  Object to form.

18     Q    Tell me what happened there.

19          MR. BOBER:  Object to form.

20     A    Someone was backing me up and I guess he

21 didn't -- I wasn't -- I don't know how to say it.

22          I had a spotter and that spotter was

23 having me to back up, and instead of him checking

24 the certain areas he was trying to get me into, I

25 came through an area that was a little bit too

1    small, and the tip of the step, I bent the step.  I

2    didn't hit it, I just backed into it a little bit.

3         Q    And that's the step off the truck?

4         A    Off the truck, yes, ma'am, the back of the

5    truck.

6         Q    So the steps were teared off from the

7    truck?

8         A    No, it wasn't tore off.  It was just bent.

9         Q    What happened after that?

10              MR. BOBER:  Object to form.

11        Q    What happened after you bent the -- after

12   the steps were bent, after that incident?  Did you

13   report it to A.A. Pittman?

14        A    Yes.

15        Q    Were you responsible for making any

16   repairs?

17        A    No, ma'am.

18        Q    Were you disciplined for that incident?

19        A    I was written up.

20        Q    You were written up?

21        A    Uh-huh.  (Nods head.)

22        Q    And A.A. Pittman determined that that was

23   your fault?

24              MR. BOBER:  Object to form.

25        A    Yeah, I guess.

Page 49

1    Q    Did you also lose a radio remote box?

2    A    It fell off the back of the truck.

3    Q    And that was -- why did it fall off the

4    back of the truck?

5    A    I don't know to, be honest with you.  I

6    hung it up and -- on the place where you're supposed

7    to hang it up at, and when I got back to the job it

8    wasn't there.

9    Q    Was it your responsibility to secure the

10   radio box?

11        MR. BOBER:  Object to form.

12   A    I mean, that was -- it was secured.

13   Q    It was secured where?

14   A    On the back of the truck where they told

15   us to put it.  I mean, you could leave it there, and

16   it's secured right there, so. . .

17   Q    So you're supposed to leave the radio

18   truck (sic) on the back of the truck?

19        MR. BOBER:  Object to form.

20   A    I mean, you could leave it a couple

21   different places, but that was one of the places

22   that I did leave it, and it came off, I guess, while

23   I was driving.

24   Q    So, when you were driving, the radio box

25   came off?

Page 50

```
 1      A    Yes.  Yes, ma'am.

 2      Q    So it wasn't secured?

 3      A    Well, it was hanging up.  I mean, it was

 4   secured -- I mean, it never fell off any other time.

 5      Q    Do you know how much those radio boxes

 6   cost?

 7      A    Yeah, I've got an -- I have an idea.

 8      Q    What is your idea of how much that costs?

 9      A    Three, 4,000 maybe.

10      Q    Did you go back to the job site to try to

11   recover the radio box?

12      A    Uh-huh.  (Nods head.)

13      Q    And what happened?

14      A    It wasn't there.  I went back numerous

15   times.

16      Q    You went back numerous times?

17      A    (Nods head.)

18      Q    Why did you go back numerous times?

19      A    To try to find the box.

20      Q    Okay, did A.A. Pittman ask you to find the

21   box?

22      A    Yes, they did.

23      Q    Did you go back numerous times the same

24   day or over a period of --

25      A    Both.
```

Page 52

1       Q       Of 2017?

2       A       '17.

3       Q       And what happened when you couldn't find

4   the box?

5       A       What do you mean?

6       Q       What was A.A. Pittman's reaction when you

7   couldn't find the box?

8       A       Well, he wasn't happy.  He wanted me to

9   pay for the box.

10      Q       He meaning --

11      A       Todd.

12      Q       -- Todd Pittman?  Todd Pittman wanted you

13  to pay for the box?

14      A       Uh-huh.

15      Q       Were you written up for this incident?

16      A       I can't recall.  I don't know if I was or

17  wasn't.  I don't think so.

18      Q       Were you verbally --

19      A       I was verbally talked to, but I don't

20  think he wrote me up.

21      Q       Maybe not wrote you up, but were you

22  counseled for this incident?

23      A       Oh, yeah.

24      Q       And he wanted you to pay how much?

25      A       Like 10,000.

Page 53

```
 1        Q     Was this in writing or verbal?

 2        A     It was verbal.

 3        Q     Do you recall when he asked you to pay for

 4   the box?

 5        A     Towards the end of '17.

 6        Q     Towards the end of 2017?

 7        A     Uh-huh.

 8        Q     Not right after you lost the box?

 9        A     Well, that was when I lost the box.

10        Q     So around in October?

11        A     Yes, ma'am.

12        Q     Did you agree to pay for the radio box?

13        A     Yeah, for a reasonable price.

14        Q     How much was a reasonable price to you?

15        A     I thought it was like 3,000 or something

16   like that.  Three, maybe 4,000, but he wanted me to

17   pay more.

18        Q     So, if he had asked for $3,000, you would

19   have paid him $3,000 for the lost radio box?

20              MR. BOBER:  Object to form.

21        A     Yes.

22        Q     And that's because you admitted that was

23   your fault for losing it?

24        A     Absolutely.

25        Q     So, when you said that you couldn't pay
```

1    particular job, and then you would leave, go to that

2    job, and set up.

3        Q    Before leaving, how long would doing the

4    paperwork and the pretrip take you?

5        A    Bobby wanted us to do about 15 minutes on

6    a pretrip.  So about 15 minutes for a pretrip, and,

7    as far as the paperwork, I don't really -- he told

8    me he wasn't going to pay me to do paperwork,

9    but. . .

10            MR. BOBER:  Speak a little louder.

11       A    I said he told me he wasn't going to pay

12   me to do paperwork, but, I mean, you would do

13   paperwork, I guess, in the midst of doing your

14   pretrip and everything.

15       Q    When did he tell you that he wasn't going

16   to pay --

17       A    It was the second time around.  I don't

18   know a date.  I heard this from Michelle, not

19   necessarily Bobby, but I heard it from Michelle.

20       Q    So Bobby did not tell you that he wasn't

21   paying for your -- to do paperwork, correct?

22       A    I heard it from Michelle.

23       Q    Okay, this is what you say Michelle told

24   you?

25       A    Yes.

1       Q    Okay.  And you said second time around, so

2   are you talking about second employment period or

3   we're still talking about the first employment

4   period?

5       A    I don't know.  The first time in the

6   beginning she told me that.  So it was the

7   beginning; I'm sorry.  It was the beginning.

8       Q    At the beginning she told you that Bobby

9   wasn't going to pay for --

10      A    Us to do paperwork.

11      Q    To do paperwork?

12      A    Yeah.

13      Q    And what type of paperwork was she

14  referring to?

15      A    Just logs, like your logs, what you were

16  doing for that day, time sheet, mileage, odometer

17  stuff, checkoffs, and pretrips, stuff like that.

18      Q    Was paperwork part of the pretrip?

19      A    At this company, yeah.  I mean, you had to

20  check off your items, what you checked or whatever,

21  what was good, what was bad, things like that.

22      Q    So pretrip means that you are checking

23  off -- I mean, tell me what pretrip is.

24      A    Pretrip is what you do for your truck.

25  You check your engine, your oil, your waters, your

1   fluid, things of that nature.

2        Q    And, as you're checking, are you checking

3   off some kind of a form or paperwork?

4        A    Yes, ma'am.

5        Q    So pretrip is part of your -- paperwork is

6   part of your pretrip, correct?

7        A    Yes, ma'am.

8        Q    And the company policy was that you take

9   15 minutes to do the pretrip?

10       A    Correct.

11       Q    Including all paperwork?

12       A    Yes.

13       Q    So you get to the shop and you do pretrip.

14  What next other than what you've already described?

15       A    After you do your pretrip, you load up and

16  you go.

17       Q    And are you paid for travel time?

18       A    Yes, ma'am.

19       Q    Normally what location did you normally

20  report to?

21            MR. BOBER:  Object to form.

22       A    The McDuff location.  I don't know the

23  name of the place.  It was off of McDuff Avenue.

24       Q    That's in Jacksonville?

25       A    Jacksonville, yes, ma'am.  Sorry.

1      Q    And there's a shed you said?

2      A    Yes, there's a shed out back.

3      Q    And what's in the shed?

4      A    It was where we went and put our paperwork

5  at the end of the day.  There was a pressure washer

6  there.  That was all we used it for.  I don't know

7  what the other stuff was for.

8      Q    So there's a pressure washer, a place for

9  you to place paperwork in?

10     A    Yeah, like a little bin for paperwork, a

11 little sprayer for your fuel, like that you put

12 gasoline or oil in to spray in the back of your

13 trucks, there were like some empty ones there, stuff

14 like that.

15     Q    And in that shed there was not a desk and

16 a chair for you to do any paperwork?

17     A    No, ma'am.

18     Q    Was there an ice machine in the yard?

19     A    No, ma'am.

20     Q    I'll show you what we're marking as

21 Exhibit 11.

22          Do you recognize this document?

23     A    Yes, ma'am.

24     Q    Can you tell me what it is.

25     A    This is the pretrip, daily report.

1       Q    So this is the paperwork you are referring

2    to when you say that as part of pretrip this is what

3    you have to complete?

4       A    Yes, ma'am.

5       Q    So do you complete -- fill this out at the

6    beginning of the day before you leave with your

7    truck?

8       A    Some of it.

9       Q    What parts would you be filling out?

10      A    The mileage in -- well, the mileage, the

11   coolant, the hours, radio, horn, drum, all that

12   stuff, the tires, driver side tire pressure, stuff

13   like that.

14      Q    So, in the morning before you leave with

15   your truck, you are checking for these things on

16   your truck?

17      A    Yes, ma'am.

18      Q    And filling out this form in the morning

19   takes you about 15 minutes?

20      A    Yeah.

21      Q    Does it take you less?

22      A    It depends.  It could, yes.

23      Q    But it usually shouldn't take you more

24   than 15 minutes?

25      A    Correct.

```
 1    my hoses, I might check my reducers, I might check
 2    my hopper, my agitators.  I mean, there are other
 3    things that I check that, you know, other guys might
 4    not check, so it might take me a little bit longer
 5    to do a pretrip.
 6        Q    So on an average how long does it take you
 7    to do a pretrip?
 8            MR. BOBER:  Object to form.
 9        A    I would say almost 30 minutes.
10        Q    I thought you told me before it was 15
11    minutes.
12            MR. BOBER:  Object to form.
13        A    Well, I mean, when you take into
14    account -- you know, I was off a little bit, but
15    just thinking about it now, it would take -- it
16    takes me a little bit longer.
17        Q    But you knew the company policy is to only
18    take 15 minutes for a pretrip, is that correct?
19        A    I mean, I was never -- yeah.  I mean, I
20    was actually told that it wouldn't be a problem,
21    nobody ever said that you had to take a 15-minute
22    pretrip.  I mean, we're talking about the first
23    time, correct?
24        Q    Sure, yes.
25        A    Yeah.  Because where I'm from, the job
```

1    sites, they take 30-minute pretrips, you know what I

2    mean.  So I was accustomed to doing 30-minute

3    pretrips, so that's what I was taking.

4         Q    So it's no more than 30 minutes, correct?

5         A    Correct.

6              MR. BOBER:  Object to form.

7         Q    Let me show you what we'll mark as

8    Exhibit 14.

9              Do you recognize this set of documents?

10        A    Yes, ma'am.

11        Q    Can you describe them for me.

12        A    These are the addresses and links to the

13   Google map to get to the addresses.

14        Q    Whose number is that on top, 352-221-5541?

15        A    Somebody from CFCS.

16        Q    This is text messages from CFCS to your

17   phone?

18        A    Yes, ma'am.

19        Q    And were these text messages provided to

20   you on your phone?

21        A    Yes, ma'am.

22        Q    Somebody from CFCS was texting you maps to

23   the job the next day, is that correct?

24        A    Yes, ma'am.

25        Q    Did you use this to determine how long it

Page 152

1    hours of overtime?

2         A    Yes, ma'am.

3         Q    And is that overtime still based on the

4    30-minute lunch deductions that were taken when you

5    worked over eight hours?

6         A    Yes, that's based off everything.  I

7    worked over eight hours, yes.

8         Q    Is it based on the lunch deductions or is

9    it based on something else?

10        A    It's everything.  I worked over eight

11   hours.  I'm sure it included the eight-hour lunch

12   deduction as well, yes.

13        Q    Were you paid overtime when you worked

14   over 40 hours a week?

15        A    Yes, ma'am.

16        Q    Have you done a different accounting of

17   your overtime claim since filing this amended

18   complaint?

19        A    Can you elaborate a little bit more.

20        Q    Yeah.  Have you done any other -- have you

21   done an accounting of your overtime claim since this

22   amended complaint was filed on August 6th, 2019?

23        A    When you say done accounting, you mean --

24        Q    Any kind of calculation --

25        A    Oh, yes, ma'am.

1        Q     So that would have been on or around

2    August 24th?

3        A     Yes, ma'am.

4        Q     And what did you say to Michelle?

5        A     Basically I advised her that I had worked

6    more hours than what I was paid and that I wasn't

7    happy about my check and was trying to figure out

8    why I didn't get paid for my hours and I basically

9    wanted -- I wanted an explanation of where my money

10   had went since I had worked the hours.

11       Q     So anything other than -- did you give her

12   any specifics about what you were talking about?

13       A     What do you mean specifics?  You mean like

14   I show her my timesheet --

15       Q     Yeah, did you go over any timesheets with

16   her?

17       A     Yes.

18       Q     For this specific time period, pay period?

19       A     I think I went every -- I didn't -- yeah,

20   I'm saying I did go over with her, yes, but I

21   didn't -- the other stuff I didn't have to worry

22   about, because there wasn't any time to go over.  I

23   didn't work overtime.  It was just the two days --

24   the two weeks.

25       Q     So the first time you earned overtime you

1   said that you told her that you worked more hours

2   than you were paid, is that correct?

3        A    Correct.

4        Q    Did you tell her anything else?

5        A    Like what?

6        Q    Did you tell her anything

7   about -- anything else when you were telling her

8   that you worked more hours than you --

9        A    Yeah, I wanted my money back, I wanted to

10  get paid for the hours worked.

11       Q    So other than you told her that you wanted

12  to be paid?

13       A    Yes, ma'am.

14       Q    Anything else?

15       A    I can't remember.

16       Q    What was Michelle's response to you?

17            MR. BOBER:   Object to form.

18       A    She said she would talk to Bobby.  I mean,

19  just playing it in my head, I think she said she

20  would talk to Bobby and try to find out what was

21  going on with payroll and that -- I think that was

22  it.  That's basically what it was, you know.  That's

23  all I can think of.

24       Q    And then when's the next time you talked

25  to Michelle about -- or did you talk to Michelle

1    giving your time back, which I thought was cool.  I

2    was like, okay, well, you know, we're going to be

3    able to work past it, you know.

4            And then she also said that he had gave an

5    additional $50, and I was like, okay, that was cool.

6    And then she said, "By the way, you know, he said

7    you're fired."

8        Q    Okay.  Do you remember when that was?

9        A    Probably that weekend, the weekend of the

10   14th.  So maybe that Saturday, Saturday or Sunday,

11   something like that.  I don't remember.

12       Q    And was this over the phone or in person?

13       A    It was in person.

14       Q    In person, Michelle told you that you were

15   fired?

16       A    Yes.

17       Q    And she told you that at the same time

18   that she gave you the check or did she say that

19   Bobby would be cutting a check?

20       A    No, when she -- when we met that day, she

21   had a check in her hand, provided me a check and

22   said that, "Bobby was willing to give you your

23   time."  I was like, "Okay, not a problem, thank

24   you."

25            "By the way, he added $50 for you, you

1  know, and you're fired.  He said that you were

2  fired.  He wasn't happy with you."

3      Q    She told you that he wasn't happy with

4  you?

5      A    Yes, ma'am.

6      Q    Did she give any other reason?

7      A    Other than me complaining about my time,

8  no.

9      Q    And so you kind of told me the first time

10  you made -- you complained about your time to

11  Michelle, you said that you told her that you

12  were -- you had worked more hours than you were

13  paid.  The second time, what other specific

14  complaints or statements were made to Michelle?

15      A    I told her I was going to contact Bobby

16  myself, and I think I tried calling Bobby a couple

17  times.  I never got any answer, but, I mean -- so I

18  just kept going through Michelle.

19          And I think I e-mailed -- I e-mailed the

20  company, I believe, to try to get an understanding

21  of what was going on, but, I mean, I got -- I don't

22  know -- remember the e-mail.  I provided what I had,

23  but that was -- and that was that.  It wasn't

24  nothing else to be said.

25      Q    What e-mail?  What e-mail to whom?

```
 1      A    It was to -- I think it was either to

 2   Patti or to April, one of them.

 3      Q    I don't think that I've seen an e-mail

 4   during this time period produced by you.

 5      A    You haven't seen any e-mails produced by

 6   me at all?

 7      Q    During this time period from August or

 8   September of 2018.

 9      A    Like I said, I gave you guys what I had.

10      Q    You say that you sent an e-mail to

11   somebody?

12      A    Maybe I -- I believe so.  I know I called.

13   I know I called, and maybe I'm confusing the first

14   time with the second time that I sent a bunch of

15   e-mails, but I did try and get the problem rectified

16   and it didn't get rectified.  He fired me.

17      Q    So you never spoke with Bobby regarding

18   your time or pay?

19      A    No.  No, he wouldn't answer my phone call.

20      Q    How many times did you try to call him?

21      A    I don't remember.  I don't know.

22      Q    Did you try to call him at his office?

23      A    I tried to call him on his cell phone --

24   not his cell phone but the office phone.  I'm sorry.

25   I didn't have his cell number, but, yeah, the office
```

1    thought they were in violation.  I didn't know the

2    name.  I couldn't say it specifically.  I just knew

3    it was a name for it.

4        Q    So I think we went over the first time you

5    talked to Michelle.  The second time you said

6    that -- the second time you worked overtime you

7    talked to Michelle about your pay also --

8        A    Yes, ma'am.

9        Q    -- is that right?

10       A    Yes, ma'am.

11       Q    And that conversation, just recap that for

12   me again.  You know, what was the exact

13   conversation?

14       A    I don't know what the exact conversation

15   was.  I mean, you're asking me to do something

16   almost a year ago.  I don't recall.  I thought she

17   was in -- they were in violation of my time, taking

18   my time from me.  I let it be known, and that was

19   that.  I mean. . .

20       Q    And the next time that you had a

21   conversation with Michelle was when she had the

22   check from Bobby?

23       A    Correct.

24       Q    And Michelle was communicating that it was

25   Bobby's decision to terminate your employment?

1      A     Correct.

2      Q     She said that it wasn't her decision?

3      A     Correct.  She didn't have the ability to

4  fire or hire me, so. . .

5      Q     So it was your understanding that it was

6  Bobby who was terminating you?

7      A     She said it was Bobby.

8      Q     And if your attorney did not provide us

9  with any e-mail during this time period in August or

10  September of 2018, you're mistaken that there was an

11  e-mail, is that correct?

12      A     I could be mistaken about the e-mail, yes.

13      Q     There's not like an e-mail that you did

14  not turn over?

15      A     No, no.

16      Q     So Bobby is the decision-maker, not

17  Michelle in regards to your termination?

18      A     Correct.

19      Q     And you did not witness Michelle and Bobby

20  having any communications regarding you, is that

21  correct?

22      A     Correct.

23      Q     And you're not aware of what Michelle told

24  Bobby, is that right?

25      A     Correct.

1       Q    So, after receiving this paycheck for six

2   hours at the regular rate, did you tell Michelle

3   that this was not enough?

4       A    Yes.

5       Q    And what was her response?

6       A    Nothing she can do.  "Nothing you can do,

7   Cap.  This is what Bobby felt like he owes you and

8   he gave you an extra $50 just to -- you know, for

9   good measure," and that was it.

10      Q    Did you talk to Bobby about this after

11  Michelle told you that?

12      A    No, I did not.

13      Q    You did not contact Bobby after receiving

14  this check?

15      A    I don't believe so, no.

16      Q    Or after she terminated you or she said

17  that Bobby was terminating you?

18      A    I did not talk to Bobby.  I cannot say I

19  didn't try to contact him, but I did not talk to

20  Bobby.

21      Q    Do you have any evidence showing that you

22  tried to contact Bobby?

23      A    I provided everything that I have to you

24  guys.

25      Q    Did you keep any diaries or any logs of

1      A      I was going to an appointment.

2      Q      What kind of appointment?

3      A      Radiation appointment.

4      Q      So that's for your personal appointment,

5  correct?

6      A      Correct.

7      Q      And you're not entitled to claim that

8  time --

9      A      Correct.

10      Q      -- to go to your personal appointment,

11  that's correct, right?

12      A      Correct.

13      Q      And from 2:30 to 4:50 you say you leave

14  appointment at the (sic) shop and travel 2.5 hours,

15  is that right?

16      A      I left my appointment, arrived at the shop

17  slash travel.  So all that was -- all that took two

18  hours -- two and a half hours.

19      Q      Were you trying to claim 2.5 hours for

20  traveling back from your appointment to going back

21  to the shop?

22      A      No, I was documenting what I had did that

23  day so there won't be a discrepancy.

24      Q      Okay, you were not trying to claim that

25  you were entitled to be paid for that time?

```
 1      A    Correct.

 2      Q    Because you're not entitled to be paid for

 3  that time, correct?

 4      A    Correct.

 5      Q    And it says here you got here at

 6  5:00 -- I'm sorry -- yes.  Did you get back to the

 7  shop at 4:50?

 8      A    Yes, ma'am.

 9      Q    So 4:50 to 5:30 you say,

10  "Post-trip/wash/--" is that fill up water?

11      A    Yes, ma'am.

12      Q    And you put one hour?

13      A    Yes.

14      Q    Okay, were you trying to claim one hour

15  for doing all of that post-trip work?

16      A    Well, it took me that much time to wash my

17  truck, to do all that.

18      Q    It took you an hour to wash your truck?

19      A    Yeah, and to take the concrete -- get the

20  concrete that was off of it, to do my post-trip and

21  my paperwork, yes, it took an hour.

22      Q    What was it about that job that took you

23  that long?

24      A    I don't remember.

25      Q    Do you recall what type of job this was,
```

1    whether it was a commercial slab or a residential

2    slab?

3        A    Residential.

4        Q    Okay.  And normally for a residential

5    post-trip, does it take you about an hour to do a

6    post-trip?

7             MR. BOBER:  Object to form.

8        A    It depends on what gets on your truck, how

9    dry the concrete gets on your truck.  I mean, he's a

10   very stickler about clean trucks, so I try to keep

11   the truck as clean as possible.

12            I didn't know I had to -- I didn't know

13   that it was going to be an issue with documenting

14   like what actually took place.  That's what I was

15   doing.  So, I mean, I was trying to be as truthful

16   as possible.

17       Q    So you wrote 4:50, you're in 4:50 and out

18   5:30, but you wrote one hour, but that's not

19   accurate, is it?

20       A    No, that's not accurate.

21       Q    Why did you put one hour?

22       A    Bad math, I guess.

23       Q    And did you tell anybody that you were not

24   trying to claim for going to the doctor's

25   appointment based on this timesheet?

```
 1       A    What you mean that I wasn't trying to?  I

 2  spoke with them and they told me to go to my

 3  doctor's appointment, so they knew that I wasn't

 4  going to get paid that time anyway.

 5       Q    So you relied on CFCS to go through all of

 6  your time entries and figure out the time that you

 7  went to the doctor's appointment, how the time

 8  should be accounted for?

 9            MR. BOBER:  Object to form.

10       A    No, that's why I put the time down the way

11  that I did, so that they would know.

12            I mean, yeah, the hour isn't as correct.

13  What was it, 40 minutes, something like that?  Not

14  an hour, but it's 40 minutes, from 4:50 to 5:30.

15  It's 40 minutes.  I put an hour, so that was just,

16  you know, a little bit of bad math, but I wasn't

17  trying to like overcompensate or anything.

18       Q    So here you're saying that your claim

19  would be from 5:00 to 5:30 less the time that you

20  were at the doctor's appointment traveling to and

21  from?

22       A    You're saying am I claiming that or is

23  that just what I'm documenting?

24       Q    Were you required to document even your

25  personal time on your timesheet?
```

1    A    No, but I did it anyway.  That was one of

2   the pet peeves that they had was that I was

3   documenting too much information.

4    Q    Okay, so the company -- you were

5   documenting too much, tell me about that.

6    A    I was just documenting too much

7   information.  I mean, everything that I did I wanted

8   to document it so there wouldn't be a problem.  If I

9   went to the store, if I went to the bathroom, I was

10  documenting it in the beginning.  I was trying to

11  document everything that I could -- I needed to so

12  there wouldn't be an issue where my time was coming

13  from.

14   Q    But you weren't trying to claim the

15  doctor's appointment?

16   A    No, ma'am.

17   Q    So here it looks like you were given 9.5

18  hours less 30 minutes for -- 30 minutes were

19  deducted for lunch and given nine hours of work

20  time.  Do you have any dispute with that?

21       MR. BOBER:  Object to form.

22   A    No, ma'am.

23   Q    There's no issue based on this timesheet?

24   A    No, ma'am.

25       MR. BOBER:  I don't know if this is an on

Page 197

1    the arrive time.  What is this?

2        Q    So, if that was the concrete arrive time,

3    6:30, then the company would want you to be at the

4    job site at 6:00, is that right?

5        A    Yes.

6        Q    Okay.  And there really isn't any reason

7    for you to be at the job site at 5:35?

8             MR. BOBER:  Object to form.

9        A    I mean, it probably was an accident or

10   something going out that way that day, so I probably

11   left earlier to get there earlier.

12       Q    Well, it says you left at five and you

13   arrived at 5:35, so it took you about 35 minutes to

14   get to the job site?

15       A    So I -- yeah.

16       Q    So it's fair to say that you arrived at

17   the job site too early?

18       A    No, you never arrive too early.  I mean,

19   you can -- you can try to be on time.  I mean, I

20   probably didn't know where I was going or the area

21   at that time.  Here it doesn't even tell me where I

22   was going.  So I probably was unfamiliar with the

23   area and wanted to go out a little bit earlier so

24   that I get there on time.

25       Q    Okay, but in fact it only took you 35

1    minutes.

2         A    It took me 35 minutes, yes.

3         Q    And you came in at 4:15 that day?

4         A    Yes.

5         Q    To do pretrip?

6         A    Yes.

7         Q    And you did pretrip for 30 minutes?

8         A    Yes.

9         Q    And then it took you 15 minutes to leave

10   the shop?

11        A    Yeah.

12        Q    So basically you were spending about an

13   hour at the shop prior to leaving for the job?

14        A    About, yeah.

15        Q    And the company policy is that you spend

16   15 minutes to do the pretrip, correct?

17        A    What the company policy doesn't say is

18   what else that might occur on that job -- I mean,

19   for that morning.  There might be something wrong

20   with my truck.  It could have been something wasn't

21   working on my truck.  I could have been closing the

22   gate, opening the gate.  I could have been doing

23   something else.  I mean, company policy doesn't

24   state any of that.  I mean. . .

25        Q    How do you anticipate some of the things

```
 1                MR. BOBER:  Object to form.
 2        A    It is early (sic) for you to come in that
 3   early if you're unfamiliar with what you're doing, I
 4   mean, yes.
 5        Q    Yes what?
 6        A    Yes, it is early.  Yes, you can -- yes,
 7   it's normal that you might come in earlier than they
 8   want you to come in to try to get what you need to
 9   get done.
10        Q    You know, it sounded to me like there were
11   circumstances that you can't tell me about, but you
12   believe there are circumstances that required you to
13   come in this early, but it's not normal to come in
14   this early.
15                MR. BOBER:  Object to form.
16        A    There are circumstances why I came in
17   early and there was a reason for me to come there
18   early.  I can't tell you specifically why I came in
19   on that day.  That's just like you don't know what
20   you did last year February 2nd at 2:00 in the
21   morning.  You don't know what you did that day, or
22   don't know why you wrote that note.  You know you
23   wrote it for a reason, right?
24                So that's why -- I came in early for
25   whatever reason.  I don't know why, but it was for a
```

1   reason, and I just -- I documented it.  I wasn't

2   trying to get over anything, but I documented what I

3   needed to document.

4        Q    And you documented it by saying pretrip.

5   You said you're documenting it.  Any other

6   documentation you're talking about?

7        A    No, ma'am.  I'm sorry, just here on this

8   timesheet.

9        Q    This is the only documentation about the

10  type of work that you're doing?

11       A    (Nods head.)

12            MR. BOBER:  Object to form.

13       Q    Let's look at the next exhibit, 21.  Are

14  these timesheets that you filled out also?

15       A    Yes, ma'am.

16       Q    So on August 24th, the last page, CFCS

17  104, you have here stating that you did post-trip

18  for 30 minutes and pressure washed your truck for

19  about an hour, is that correct?

20       A    Yes, ma'am.

21       Q    Was it normal for you to wash your truck

22  for about an hour?

23            MR. BOBER:  Object to form.

24       A    If it took you that long.  I mean, he

25  liked a clean truck, so we made sure we had clean

1  two slabs at the same job site or not?

2      A    This is saying there was two slabs, but I

3  don't know if they were right by each other or not,

4  because I didn't put the actual lot number.

5      Q    But it looks like at 9:45 you started and

6  finished the first slab and at 9:50 you were able to

7  start the second slab, is that correct?

8      A    Yes, ma'am.

9      Q    So they couldn't have been more than five

10  minutes apart.

11      A    Correct.

12      Q    On August 30th, CFCS 100 --

13      A    I'm sorry, what was the number?

14      Q    One hundred, CFCS 100, the timesheet and

15  daily pump schedule the next day.  And then if you

16  want to reference the daily pump schedule, CFCS 207.

17          So for that day it looks like the job time

18  was 7:00.  So, if the start time -- or the concrete

19  arrival time was 7:00, you had to be there at 6:30,

20  is that correct?

21      A    Yes, they wanted you to be there at 6:30,

22  yes.

23      Q    And here it looks like on your timesheet

24  you arrived at the job site at five, is it 46?

25      A    Arrived job site at 5:46, yes.  Again, I

```
 1   had three lots that day.  So I may have prepped for

 2   that lot, maybe tried to find that lot, because not

 3   all lots are next to one another.  One lot might be

 4   around the corner.  Another lot might be around this

 5   corner.  It might be down the street.  So I wasn't

 6   familiar with the area, so I wanted to get there

 7   early.

 8        Q    Why did you come in at 4:15 to do pretrip?

 9        A    Because I wanted to get there early.  I'm

10   very punctual.  I've never been late for a job.

11        Q    Okay, and you didn't have to leave until

12   5:00, right?

13             MR. BOBER:  Object to form.

14        Q    Let me rephrase.  So you left for that job

15   at 5:00?

16        A    Yes, I -- yes, I left at 5:00.

17        Q    And you did that because you wanted to get

18   to the job site early?

19        A    Yes.

20        Q    And then you came in at 4:15, and it took

21   you 45 minutes to do pretrip and paperwork?

22             MR. BOBER:  Object to form.

23        A    I mean, I had three lots that day.

24        Q    What are you doing for the three lots?

25        A    I mean, I'm pretripping, I'm filling out
```

Page 213

```
 1       A    No, this is just one, one for each -- I
 2   mean, just one for the day.
 3       Q    On August 31st, CFCS 99, look at the Daily
 4   Pump Schedule for that day, CFCS 208.
 5            So, if you were on a job -- if your job
 6   schedule indicates that the pump arrival is 7:00,
 7   you would normally be there at 6:30, correct?
 8            MR. BOBER:  Object to form.
 9       A    Yes, that's the time they wanted you to be
10   there.
11       Q    Okay, the company wants you to be there at
12   6:30?
13       A    Correct.
14       Q    And on August 31st you arrived at the job
15   site 5:55, is that correct?
16       A    Correct.
17       Q    And you got to the shop at 4:00, is that
18   correct?
19       A    Yes, ma'am.
20       Q    So you were there one hour before you left
21   for the job?
22       A    Yes, ma'am.
23       Q    And you say here that you spent 30 hours
24   on pretrip and another 30 hours on paperwork?
25       A    No, not 30 hours.
```

1      Q    I'm sorry, 30 minutes.  Excuse me.

2      A    Thirty minutes, yes, ma'am.

3           But, again, I don't know what transpired

4    that day or why I got there so -- why I took a

5    little bit longer to do paperwork and stuff.

6    Probably something going on with my truck.  I don't

7    know.

8      Q    Do you know if there was something going

9    on with your truck like the day before or when would

10   you know that?

11     A    See, I don't recall, because on the

12   30th -- on the 30th, some of this is not even my

13   writing, so I don't know what happened on that day.

14     Q    What is not in your writing?

15     A    Where it says. . .

16     Q    The times that you wrote --

17     A    This ten to -- that bottom line, that's

18   not mine.  I don't know whose writing that is.  It's

19   not mine.  And this other stuff on the side,

20   concrete for 7, that's not my writing.

21     Q    Are we looking at August 31st?

22     A    The 30th, I'm sorry.

23     Q    August 30th --

24     A    That's why I'm saying something could have

25   happened -- might have happened from the 30th to the

1    31st is why I came in so early.  Plus this was going

2    to St. Mary.  So that's about an hour and some

3    change away, I think.

4         Q    So here you wrote that it took you from

5    5:00 to 5:55 to get to the job site.

6         A    Yes, ma'am.

7              MR. BOBER:  Which one are you looking at?

8              MS. YOON:  On August 31st.

9         Q    So it took you less than an hour to get to

10   the job site, correct, to St. Mary's?

11        A    It took me less than an hour to get to the

12   job site, but it probably took me a little longer

13   than that to find the actual slab.

14             See, that's what you guys are not

15   realizing.  Just because you get to the job site,

16   you might get to the job site, but it might take you

17   a little bit longer to find where you're going.

18        Q    So you say "Leaves shop/arrived at slab."

19   That travel time doesn't include like getting to the

20   slab?

21        A    Yeah.

22        Q    It does, doesn't it?

23        A    Yeah.

24        Q    And on that very same day, on August 31st,

25   you wrote here that you did post-trip for one hour

Page 216

1    and -- is it one hour -- one hour and paperwork for

2    another 30 minutes, is that correct?

3         A    Yes.  Again. . .

4         Q    So do you have any recollection of why it

5    took you one and a half hours to do post-trip and

6    paperwork on that day?

7         A    Almost a year ago, no, I don't.

8         Q    I'm going to show you what we'll mark as

9    Exhibit 23.

10             Are these the timesheets that you filled

11   out for September 5th through September 11th?  We're

12   going backwards from the back.

13        A    Yes, ma'am.

14        Q    September 5th, if we look at the pump

15   schedule for that day -- and let's go ahead and -- I

16   think September 5th was missing and --

17             MS. YOON:  Peter, I think this is the

18        document that I may have sent you yesterday,

19        the additional pump schedule that we found, and

20        we Bates numbered it 394.  So I'm going to go

21        ahead and introduce this as Exhibit 24.

22        Q    The pump schedule for that date shows that

23   you have a job with a 30 -- it says 7:30 a.m.

24   concrete arrival time.  So --

25        A    I don't even see my name on this.

1   that detail on this timesheet, correct?

2       A    I put it on a lot -- in the beginning I

3   put it on a lot of them.  A lot of my timesheets in

4   the beginning I put the detail and then stopped

5   doing it.

6       Q    So up to this point you were putting in

7   the details that you thought were appropriate?

8       A    Uh-huh.  (Nods head.)

9            MR. BOBER:  Objection to form.

10      Q    And on the same date you arrived at the

11  shop at 3:30 and you left at -- is that 5:20?  Does

12  that look correct?

13      A    Yes, ma'am.

14      Q    And during that time you're saying that

15  you did post-trip and washed the truck, is that

16  correct?

17      A    Yes.

18      Q    So for almost two hours or an hour and 50

19  minutes you were doing post-trip and washing the

20  truck?

21      A    Correct.

22      Q    I'm going to show you what we'll mark as

23  Exhibit 25.

24           I apologize.  If we can go back to 23.  If

25  you can turn to Bates number 00097 for September 6.

1     Q     -- that day?

2           And you say you did pretrip for 30

3     minutes, another half hour doing paperwork?

4     A     Yes, ma'am.

5     Q     If you can turn to CFCS 96 for

6     September 7th.

7     A     I'm sorry, what was it?

8     Q     CFCS 96 for September 7th from your

9     timesheets.  It's the very next day, the 7th.

10          So, based on the Daily Pump Schedule, the

11    schedule has you going to St. Augustine with a

12    concrete arrival time of 7:00.  If you can turn to

13    the pump schedule for the next day.  Should be the

14    very next page.

15          So the company wants you to be there on

16    the job at 6:30 for this job, correct?

17    A     Correct.

18    Q     And it looks like you got here -- got at

19    the job site around 6:15 according to your

20    timesheet?

21    A     Yes, ma'am.

22    Q     And you arrived at the shop at 4:00 a.m.

23    that day?

24    A     Yes, ma'am.

25    Q     And you spent a half hour doing pretrip

Page 224

1    and another 15 minutes doing paperwork?

2        A    Yes, ma'am.

3        Q    And then another 15 minutes

4    gathering -- it says, "Gathered extra paperwork"?

5        A    Yeah.  At this time I couldn't -- I lost

6    some of my stuff -- I ran out of my paperwork, so I

7    needed to get more, more documents.

8        Q    More documents, meaning the --

9        A    Yeah, pretrip forms, you know, the

10   contractor forms, the milage forms, all that stuff.

11   I needed to get that.  It was something -- I don't

12   know if at that time it was in the shed.  I think I

13   had to wait for somebody to come for me to get into

14   the building that time.

15       Q    So we looked at two forms and then you

16   just mentioned mileage form.  Is there another form

17   that we didn't discuss?

18       A    I think there's another form that they

19   use.  There's more than two forms, I think.  I don't

20   know what the other form is.

21       Q    Exhibit 12 and Exhibit 11 are the forms

22   that we talked about, the paperwork you filled out

23   as part of your pretrip.  Is there anything other

24   than Exhibits Number 11 and 12 that you're filling

25   out?

```
 1        A    I can't recall.  I can't recall.  I don't
 2   know.  My memory is not serving my recollection that
 3   well for that particular day.  I don't know.
 4        Q    Is it possible there are no other forms
 5   that you need to fill out as part of your pretrip?
 6        A    No, I thought there was more than one
 7   form.  I thought it was more than two forms that we
 8   filled out daily.  I could be wrong on that.
 9        Q    And going back to your timesheet for
10   September 7th, it looks like you're saying you
11   arrived at the shop at 12:30 and you did post-trip
12   until 2:40 or 2:45, is that correct?
13        A    Post strip/pressure wash/paperwork.
14        Q    Okay, all of that took you two hours and
15   15 minutes?
16        A    Yes, it did.
17             And, for the record, when I wash my truck,
18   pressure wash my truck, most of the guys, they just
19   washed off the truck and went home.  I washed the
20   truck to keep it in immaculate condition, to keep
21   the concrete off of it.  Concrete builds up.  I
22   washed underneath the tires, the wheel wells, all
23   that particular stuff to make sure that it wasn't
24   anything left on there.
25             So that's why, you're asking me about
```

1   this, why it took me a little bit longer to wash the

2   truck is because I took care of my truck and prided

3   my vehicle.

4        Q    Did the company want you to spend an hour

5   washing your truck?

6        A    He wanted his trucks cleaned.

7        Q    Did the company want you to spend one hour

8   cleaning the truck?

9        A    He wanted the truck cleaned, and that's

10  what I did.

11       Q    You're not answering the questions.  Do

12  you know if the company wanted you to spend one hour

13  cleaning the truck?

14       A    They didn't tell me I couldn't.

15       Q    The company didn't tell you that you need

16  to do only 30 minutes post-trip?

17       A    That's under the condition that you don't

18  have anything else wrong with your truck.  I mean,

19  if you have other stuff wrong, it's going to take

20  you longer than 30 minutes to wash your truck.  I

21  mean, it might take you an extra 15, 20 minutes to

22  get additional concrete off of your vehicle.

23            So, yes, they wanted you to take 30

24  minutes, but it might take you a little bit longer.

25  What's wrong with it taking you a little bit longer

1   if you want the truck clean and he wants it clean?

2   I mean, I don't see anything wrong with that.

3       Q    If the company did not want you to spend

4   more than 30 minutes cleaning the truck, you don't

5   consider that to be a directive, work order?

6       A    I consider it being -- you're taking value

7   in the company property.

8       Q    So you can take as long as you want

9   cleaning and being -- charging your employer for

10  that work?

11      A    No, I'm not saying that.  I'm saying that

12  you take value -- take pride in your vehicle, that's

13  what I'm saying.

14          MR. BOBER:  I wanted to maybe ask you

15          something off the record if you're done.  I

16          didn't want to interrupt this line of --

17          MS. YOON:  Sure.

18          (Brief off record discussion.)

19      Q    So if you can turn to September 11th.

20  It's the first page of Exhibit 23.  Go to the Daily

21  Pump Schedule for the next day or next page, 9/11,

22  Mr. Beasley.  So if you can go to 9/11, CFCS 214.

23          So, if that's a 7:00 job, the company

24  wants you to be there at 6:30, correct?

25      A    Yes, ma'am.

Page 228

```
 1        Q    And on your timesheet it states that you
 2   arrived at the job at 6:00, is that accurate?
 3        A    I'm sorry.  What was your question?
 4        Q    According to your timesheet, is it
 5   accurate to say that you arrived at the job site at
 6   6:00 instead of 6:30?
 7        A    Yes.
 8        Q    And you came into the shop at 4:00 that
 9   morning?
10        A    Yes.
11        Q    And you spent 30 minutes doing pretrip and
12   30 minutes doing paperwork?
13        A    Yes.
14        Q    And another 20 minutes, it says "Oiled up
15   oil can"?
16        A    Yes.
17        Q    So, when you were doing something outside
18   of just doing paperwork or pretrip, you made a note
19   of it, correct?
20        A    Sometimes.
21             MR. BOBER:  Object to form.
22        Q    In this instance, you did that?
23        A    In this instance.
24        Q    And let's turn to 25, Exhibit 25.  I think
25   I want to -- so on 9/12, CFCS 94, the last page of
```

1      A     Yes.

2      Q     And you came into the shop at 4:30, and

3   from 4:30 to 5:20, you spent 50 minutes filling up

4   oil and diesel for sprayer slash fixed oil sprayer,

5   correct?

6      A     Correct.

7      Q     And you spent another 30 minutes doing

8   pretrip and paperwork?

9      A     Yes, ma'am.

10     Q     If you can turn to 9/14.  Under paragraph

11   seven there's a job time of 6:30 a.m.  So the

12   company wants you to be on the job site at 6:00,

13   correct?

14     A     Yes, ma'am.

15     Q     Do you recognize this as your last day of

16   work?

17     A     I think so, yes, ma'am, around about.

18     Q     Do you -- and this job was in Ocala?

19     A     I don't see a -- oh, yes.

20     Q     Was this a job in Ocala?

21     A     Yes, ma'am.

22     Q     And also I had noticed in all the

23   timesheets that we had gone over under job location

24   you had put Jacksonville even though there were some

25   locations that were not actually in Jacksonville.

Page 232

1    Is that correct?

2            MR. BOBER:  Object to form.

3      A    I don't remember.  I mean, if it was -- I

4    guess.

5      Q    Were you actually required to put the

6    actual location of the job, not Jacksonville,

7    correct?

8      A    Yeah.

9      Q    So, if the job was in Ocala, you needed to

10   put Ocala instead of Jacksonville.  Same thing, if

11   it was St. Augustine, you needed to put

12   St. Augustine and not Jacksonville?

13     A    My mishap, oversight.

14     Q    I just couldn't really read it correctly,

15   so if you don't mind looking at the second line,

16   it's --

17            MR. DONNELLY:  Do you need a break?

18            MS. YOON:  I'm so sorry.

19            (Eleven-minute recess.)

20     Q    I just want to turn your attention

21   to -- we're still at Exhibit 25, CFCS 92, for

22   September 14th.  It looks like you wrote 3:15 to

23   3:45, pretrip dash paperwork, is that correct.

24     A    Yes.

25     Q    So for this job you completed pretrip

Page 235

1    at shop.  So total time travel and fuel, you're

2    saying it took you less than two hours coming back,

3    correct?

4         A    Yes.

5         Q    And here you say 1:15 to 1:45 paperwork

6    and -- can you tell me what the rest of that reads.

7         A    I don't know.  I was trying to see what

8    that says.  I don't even know -- I don't know what

9    that is.

10        Q    And you have 30 minutes there?

11        A    Yes, 30 minutes, but I don't know what

12   that says.

13        Q    Does that --

14        A    Train?  I'm not sure what that says.

15        Q    Okay.  If you can't read what you wrote,

16   is it fair to say it's hard for somebody else to try

17   to figure out what you wrote there on your

18   timesheet?

19             MR. BOBER:  Object to form.

20        A    On that particular time, yeah.

21        Q    Do you remember anything about what

22   happened after you came back from this job on

23   September 14th?

24        A    Like what?

25        Q    Any conversations that you might have had

1        Q     If you can specify what you mentioned to

2   her, something about what?

3        A     Something in reference to how can they

4   take breaks from you if you don't take -- if you

5   don't take -- how can they take breaks from you if

6   you don't take an uninterrupted break, something to

7   that form.

8        Q     So, from the very beginning, you knew that

9   the company policy was for you to take a 30-minute

10  meal break, correct?

11       A     Well, I knew that if they took eight hours

12  from you, that they would take your break -- I mean,

13  take your 30 minutes from you.  That's what I had

14  the issue with was them taking the money from me

15  after working eight hours.

16       Q     So the company policy was that, if you

17  work over eight hours, they would deduct 30 minutes

18  from you because they required you to take 30

19  minutes meal break, correct?

20       A     Correct.

21       Q     And why did you not take -- did you take

22  30 minutes uninterrupted meal breaks?

23       A     It's impossible for you to take an

24  uninterrupted break.

25       Q     Why is that?

1      A    Because you have to keep your concrete

2  moving.  You have to keep it recycling.  You can't

3  sit there for 30 minutes and let your concrete just

4  sit there without flushing it back and forth -- it's

5  called recycling -- without it blocking up your

6  pump.  And sometimes the trucks come 15 minutes at a

7  time or ten-minute increments, something like that,

8  so you can't really -- you have to scarf down what

9  you can scarf down and keep moving.

10     Q    Are there times when the trucks arrived

11 more than 30 minutes?

12     A    Sometimes.

13     Q    Sometimes it comes more than an hour?

14     A    Sometimes.

15     Q    And during that time you don't have time

16 to take an uninterrupted lunch break?

17     A    No, because you have to keep it moving.

18 You have to keep your concrete moving every seven

19 minutes, seven to ten minutes.  So there's no time

20 to take an uninterrupted break.

21     Q    What about when you're done with pumping

22 the concrete and washing the truck out, at that time

23 are you able to take a meal break?

24     A    If you're on your way back home, I mean, I

25 guess you could sit there and take a 30-minute

Page 239

1    break, but, I mean, most of the time you finish

2    washing out and you leave right then and go back to

3    the shop.

4        Q    But you could have taken an uninterrupted

5    break, meal break at that time?

6             MR. BOBER:  Object to form.

7        Q    At the time you're done with pumping and

8    cleaning the concrete pump?

9        A    Yeah, I guess.

10       Q    After you were told that you were

11   terminated, where did you go to work next?

12       A    After I was terminated here the first

13   time?

14       Q    From CFCS, Inc., yes.

15       A    There was about a week that I was out of

16   work, unemployed.

17            MR. BOBER:  Speak a little louder.

18       A    I'm sorry.  There was a week that I was

19   out of work, and then I went to -- I went back to

20   Jim's.

21       Q    You went back to Jim's Concrete?

22       A    Yes, ma'am.

23       Q    So you say about a week after?

24       A    Little bit more than a week.  So it was a

25   week -- well, after I was unemployed -- I got fired,

```
 1   there was a week where I was unemployed, and then a
 2   couple days after that I went back to Jim's.
 3        Q    Did you call up Jim's Concrete and ask for
 4   a job?
 5        A    Yes, I did.
 6        Q    And they rehired you right away?
 7             MR. BOBER:  Object to form.
 8        A    (Nods head.)
 9        Q    How long did you work for Jim's Concrete?
10        A    About a month, month and a half, something
11   like that.
12        Q    So I think the last -- I just want to make
13   sure that the record is clear that the last
14   timesheet that we had looked at for CFCS was
15   September 14, 2018.  Do you have any reason to
16   believe that that wasn't the last day of your work
17   with CFCS, Inc.?
18        A    No, ma'am.
19        Q    So, if your last day of work with CFCS
20   Inc., was September 14, 2018, then you say you went
21   back to work for Jim's Concrete, it would be about a
22   week after that?
23             MR. BOBER:  Object to form.
24        A    Little bit more than --
25        Q    Sometime --
```

Page 241

```
1       A    Yeah, sometime after that, yes.

2       Q    Sometime in September, late September?

3       A    Yes, ma'am.

4       Q    And you said that you worked for Jim's

5  Concrete for a month?

6       A    Month and a half, something like that.

7       Q    Month and a half.

8       A    Yeah.

9       Q    And were you hired back as a pump

10 operator?

11      A    Yes, ma'am.

12      Q    And why did you leave after a month and a

13 half working for Jim's Concrete?

14      A    There was an incident where there was an

15 issue with a boom flipping over.

16      Q    Issue with a boom tipping over?

17      A    Uh-huh.  (Nods head.)

18      Q    Tell me about that incident.

19      A    One day I was setting up and I went around

20 and did what I thought I was supposed to do as far

21 as secure, you know, the ground or whatnot, and I

22 went to lift up my boom.  One of the outriggers

23 didn't come out, and I turned the boom on that

24 particular side where the boom wasn't extended --

25 the outrigger wasn't extended and it tipped over.
```

1        Q     The boom tipped over?

2        A     Yes.

3        Q     And are you required to put all of the

4     outriggers and check for that before taking the boom

5     out?

6        A     Yes, ma'am.

7        Q     So that is an incident that you could have

8     avoided, correct?

9              MR. BOBER:  Object to form.

10       A     I could have did better inspection, yes.

11       Q     Had you done a better inspection and

12     ensured that all the outriggers were pulled out

13     before pulling the boom, the accident could have

14     been avoided, correct?

15             MR. BOBER:  Object to form.

16       A     Maybe.

17       Q     What do you mean maybe?

18       A     Well, upon taking the outrigger out, I was

19     having some issues with that particular outrigger.

20     So I could have let the outrigger out a little

21     bit -- I thought it was out far enough, and it

22     wasn't out far enough.

23             I thought the ground was a little bit more

24     secure, which it wasn't.  So, when the boom tipped

25     over, you know, it just -- it, I guess -- I don't

Page 245

1    injuries, correct?

2            MR. BOBER:  Object to form.

3        A    If somebody's under it, yes, it could

4    cause injuries on any given day.  I mean, you could

5    cause injuries just operating it.  So, yeah, it

6    could have caused some injuries, but it didn't.

7        Q    Okay.  Do you know whether Jim's Concrete

8    lost the job as a result of the boom pump flipping

9    over?

10       A    What do you mean lost the job?

11       Q    Lost the -- couldn't continue work on that

12   job.

13       A    No, they brought in another pump.

14       Q    They brought another pump that very same

15   day?

16       A    Uh-huh.  (Nods head.)

17       Q    Is that a yes?

18       A    Yes, ma'am.  Sorry.

19       Q    So they were able to bring out another

20   pump and finish the job?

21       A    Yes, ma'am.

22       Q    Do you know if Jim's Concrete had to pay

23   any money to the customer as a result of the boom

24   pump flipping over?

25       A    I don't know anything what happened after,

```
 1      Q    Okay.  So, after being terminated by Jim's
 2  Concrete of Brevard, did you work for anybody else?
 3      A    Yes, ma'am, I did.
 4      Q    Who did you work for?
 5      A    I went back to CFCS.
 6      Q    Before going back to CFCS, you did not
 7  work for anybody else?
 8      A    No.  There was a period where I was
 9  unemployed -- there was a period where -- a day or
10  so or something like that, and I went back before I
11  started.  I didn't start immediately.
12      Q    So how did you go back to work for CFCS?
13           MR. BOBER:  Object to form.
14      A    What do you mean?
15      Q    How did you go back to work for CFCS,
16  Inc.?
17           MR. BOBER:  Object to form.
18      A    I called and asked for a job.
19      Q    Who did you call?
20      A    I called Pete.
21      Q    Do you remember his last name?
22      A    I don't know Pete's last name.
23      Q    You called Pete and asked for a job?
24      A    Yes.
25      Q    What specifically did you ask him?
```

```
 1        A    I asked him if he needed any pump
 2   operators.  He said yeah, asked me when I could
 3   start and I told him I could start immediately.  He
 4   told me to come in on Monday, I believe.
 5        Q    Did you tell him that you had been out of
 6   a job?
 7        A    No, I didn't tell him I had been out of a
 8   job.
 9        Q    You didn't tell him that you had not been
10   working since leaving CFCS the first time?
11        A    No, I didn't tell him that.
12        Q    You didn't tell him that you were starving
13   and that you needed to feed your family?
14        A    I mean, I told him I was starving, but I
15   didn't tell him that I had not been working, because
16   I wasn't making the right amount of money.  So I
17   probably told him that I was starving, yeah.
18        Q    So you think that you told him you were
19   starving?
20        A    Yes, because I wasn't making the same
21   amount of money at Jim's as I was making at CFCS,
22   so, yeah, of course I was starving.
23        Q    But you didn't tell him that you had not
24   been working?
25        A    No.
```

1     Q     And you didn't tell him that you had just

2  been terminated by Jim's Concrete?

3     A     Did I tell him that I had been just

4  terminated?

5     Q     Yes.

6     A     No, I didn't.

7     Q     Why didn't you tell him that?

8     A     He didn't ask.   I mean, I didn't -- we

9  didn't talk about any of that.

10    Q     You didn't think that it was important for

11 him to know that you had just been terminated from

12 Jim's Concrete for flipping a boom truck?

13    A     He didn't ask, so I didn't say anything.

14 I mean, it was concerning Jim's.  It wasn't

15 concerning CFCS.  I have never had any safety

16 protocols from CFCS, so I didn't think they needed

17 to know what went on at another company, so that's

18 why I didn't say anything.

19    Q     So your testimony here today is that you

20 did not represent to Pete that you had been out of a

21 job since last working for --

22    A     Correct.

23    Q     -- CFCS?

24    A     Correct, because I had not been out of a

25 job.  I had been out of money, but not a job.

1       Q    Well, you were also not out of money,

2   right, because you were working for Jim's Concrete,

3   correct?

4       A    I wasn't making the same amount of money

5   is what I'm saying.  I wasn't making the money I was

6   making at CFCS, so I was losing.

7       Q    You wanted to come back to CFCS?

8       A    Yes, I enjoyed working there.

9       Q    What part about it did you enjoy working

10  at CFCS?

11           MR. BOBER:  Object to form.

12      A    I liked the trucks, the employees there,

13  the people.

14      Q    Did you like Bobby?

15      A    Yeah, he's an employee, yeah.  I had no

16  quarrels with Bobby.

17      Q    Did you like Patti?

18      A    Yeah, I liked Patti.  I liked everybody

19  there.

20           THE WITNESS:  Hi Patti.  Hey.

21      A    I liked everybody.

22      Q    Okay.  So you had no issues with going

23  back to work for CFCS, Inc.?

24      A    No.

25      Q    So at the time that you went back to work

Page 293

1                     CERTIFICATE OF REPORTER

2    STATE OF FLORIDA
     COUNTY OF ALACHUA
3

4             I, Karen L. Biery, do hereby certify that
     I was authorized to and did stenographically report
5    the deposition of CAPAL BEASLEY; that a review of
     the transcript was requested; and that the foregoing
6    transcript, pages 3 through 291, is a true record of
     my stenographic notes.
7

8             I further certify that I am not a
     relative, employee, attorney, or counsel of any of
9    the parties, nor am I a relative or employee of any
     of the parties' attorney or counsel connected with
10   the action, nor am I financially interested in the
     action.

11

12            DATED this 27th day of August, 2019.

13

14

15                           KAREN L. BIERY
                             JOHNS, STEPHENSON & BIERY
16                           ADVANTAGE COURT REPORTERS

17

18

19

20

21

22

23

24

25