IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CAPAL BEASLEY,

    Plaintiff,

v.                                              CASE NO.: 1:19-cv38-AW/GRJ

CENTRAL FLORIDA CONTRACTORS
SERVICES, INC., a Florida for-profit
corporation; and, BOBBY J.
POWELL, JR., an individual,

    Defendants.
_____/

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
## FOR ADVERSE INFERENCE JURY INSTRUCTION

Defendants, CENTRAL FLORIDA CONTRACTORS SERVICES, INC. ("CFCS") and BOBBY J. POWELL, JR., through undersigned counsel, respond in objection to Plaintiff's Motion for Adverse Inference Jury Instruction (ECF 92).

PRELIMINARY STATEMENT

Plaintiff's motion is baseless and must be denied because:

1)   the job slips (also referred to as job tickets/invoices)—showing the amount of concrete pumping time spent at a customer's jobsite for purposes of invoicing the customer—are not relevant, <u>much less crucial,</u> to Plaintiff's claim of retaliation where Plaintiff was terminated for milking the clock <u>while he was at</u>

<u>CFCS's shop (i.e., checking the truck and filling out the daily driver report before leaving for the jobsite and washing the truck after returning from the jobsite)</u>;

2) the job slips do not contain and are not a record of Plaintiff's hours worked or wages paid, and Defendants have fully and completely produced Plaintiff's payroll records and timesheets (which show Plaintiff's hours worked as reported by Plaintiff from the beginning to the end of the workday and which include details such as shop arrival/departure time, travel time and jobsite arrival/departure time) to the extent his timesheets have any bearing on the reasons for <u>Plaintiff's first termination on September 14, 2018</u>;

3) Plaintiff fails to demonstrate bad faith (<u>i.e.</u>, intentional destruction or tampering of the documents) as there is none and in fact, as repeatedly explained, the regular business practice of discarding the job slips upon payment by customers has been in place preceding this litigation because they are never used or relied upon for payroll purposes;

4) Plaintiff was terminated the second time after CFCS learned that Plaintiff went to work for another employer, flipped a boom truck on October 29, 2018 resulting in his immediate termination from that employer and then immediately sought reemployment with CFCS on October 30, 2018 telling CFCS

that he was starving (therefore, the job slips following his rehire on October 30, 2018 do not even have a tangential bearing on the second termination); and

5) the February 25, 2019 letter from Plaintiff's attorney did not notify Defendants that the job slips should be maintained and even had the letter given such notice, there would have been only one (1) job slip by Plaintiff after February 25, 2019 which would have no bearing on Plaintiff's retaliation claim (because it post-dates Plaintiff's first termination and the second termination was unrelated to any time inflating issue).

## MEMORANDUM OF LAW

I. <u>The Legal Standard for Adverse Inference</u>

The Eleventh Circuit has warned, "In this circuit, an adverse inference is drawn from a party's failure to preserve evidence **only when the absence of that evidence is predicated on bad faith**" which the Eleventh Circuit explained was akin to tampering with the evidence. <u>Bashir v. Amtrak</u>, 119 F.3d 929, 931 (11th Cir. 1997) (emphasis supplied). Mere negligence in losing or destroying the records is insufficient. <u>Id</u>. Thus, in a wrongful death suit where the speed of the train at the time of the incident was of a paramount issue, the Eleventh Circuit nevertheless "readily" agreed with the trial court that no adverse inference was warranted based on the missing speed tape of the train as "there was no probative evidence in this

3

case to indicate appellees **purposely** lost or destroyed the relevant portion of the speed tape." Id. This was the case though "the loss of the speed tape [wa]s wholly unexplained" (unlike in an analogous case where the innocent explanation that the records were destroyed under routine procedures was, offered). In order words, no adverse inference was due because there was "absolutely no evidence of bad faith or tempering." Id. at 932.

Moreover, the party seeking an adverse inference instruction must "demonstrate that it is 'unable to prove [its] underlying action owing to the unavailability of [the alleged spoliated] evidence.'" Point Blank Solutions, Inc. v. Toyobo America, Inc., 2011 WL 1456029 at *27 (S.D. Fla. 2011) (alternations original) (citations omitted). "Indeed, '[s]poliation actions typically involve the destruction of evidence that is **absolutely crucial to the action**.'" Id. (alternations original) (citations omitted) (e.s.). Request for an adverse inference based on purported spoliation of documents which are not crucial to the party's ability to prove its case, should be denied, and no further consideration is necessary. Id. at *27-28 (denying adverse inference where plaintiff failed to show that any of the allegedly destroyed documents were "crucial" to prove its case and noting the plaintiff even moved for partial summary judgment based on documents already available) (listing cases denying request for adverse inference where alleged

4

destroyed evidence would have been duplicative or other evidence is available to prove a party's underlying claims).

II.    Argument

   A.    **Plaintiff fails to demonstrate (because he cannot) that the job slips are crucial to his case—they are not even relevant.**

The job slips are not relevant to Plaintiff's claim of retaliation much less crucial to Plaintiff's prima facie case, despite glaring and incredulous attempts to misstate the nature of the job slips as "very important" and containing "a wealth of information about how the Plaintiff was spending his work time, his hours and the unique aspects of each concrete pouring job." (Motion, p. 3) The blank copy of the job slip on its face, the reasons for Plaintiff's termination and the fact that all timesheets have been produced, belie these assertions.

Plaintiff was first terminated on **September 14, 2018** for failing to comply with company policies on the amount of time to spend performing tasks at the company shop (not the contractor/customer's jobsite), namely: 1) pre-trip (i.e., the amount of time Plaintiff spent/charged CFCS for checking the truck and doing the daily driver report at the shop prior to leaving for the jobsite); and 2) post-trip (i.e., the amount of time Plaintiff spent/charged CFCS for washing the truck at the shop after returning from the jobsite). See ECF 53 (Defendants' Motion for Summary Judgment, Statement of Facts, pp.5-6, regarding the reasons for Plaintiff's first

termination); ECF 52-1 (Powell Dec. ¶¶ 8-11). CFCS's belief that Plaintiff was milking the clock for pre-trip and post-trip work during the first employment period was based on its policy on the amount of time to spend on these tasks and the timesheets Plaintiff completed in his own handwriting for each workday, which reported 1) <u>when Plaintiff first arrived at the shop and how long he engaged in pre-trip work,</u> 2) when he left the shop and how long he traveled to the job site, 3) how long he spent pumping at the jobsite, 4) when he left the job site and how long it took him to travel back to the shop, and 5) <u>how long he spent on post-trip work (washing truck) at the shop</u>.  See id.; ECF 52-2 (Johns Dec. ¶¶ 4-5); ECF 52-8 (Plaintiff's Timesheets).  All timesheets were produced to Plaintiff.

Plaintiff's characterization of the job slips and the purported relevance of these document to the reasons for his first termination, are false.  The job slips do not contain and are not a record of Plaintiff's hours worked or wages paid. As is apparent on its face, the document is an agreement/work order between CFCS and the contractor/customer setting forth the terms of the agreement such as preconditions, the terms under which concrete pump work is to be performed, hold harmless agreement and when the payment is due. ECF 92-1

At most, the job slips show jobsite arrival/departure time and the time an operator spends <u>pumping at a jobsite</u> for a particular customer for purposes of

6

invoicing the customer for the operator's concrete pump time and not his "whereabouts, movements, hours" of work throughout the workday as alleged. The amount of time Plaintiff spent pumping at the jobsite was never an issue with CFCS or in this case, and the job slips were not used or considered by CFCS to determine Plaintiff's hours or pay or whether or not Plaintiff overinflated his time at the company shop. Moreover, the total pumping hours, jobsite arrival/departure time, travel time are all duplicative of information that are already contained on all of Plaintiff's timesheets.[1]  ECF 52-8 (Plaintiff's Timesheets)

    Tellingly, though without merit, Plaintiff filed his own partial motion for summary judgment requesting the Court to find retaliation in his favor as to the first termination on September 14, 2018 without once mentioning the absence of the job slips as an issue (ECF 55) which belies the suggestion that these job slips are somehow now "very important" or crucial to his prima facie case. Plaintiff's summary judgment motion is due to be denied because it is meritless—not because he cannot prove his case without the job slips (which is not even mentioned in Plaintiff's motion).

---

[1] Purported mileage information on the job slip is not relevant and in any event, in/out mileage information is recorded on daily driver reports which have also been produced to Plaintiff. (CFCS 399-476)

Moreover, these job slips by Plaintiff were never specifically requested in discovery (though in April 2019, Plaintiff made a specific request for a <u>blank</u> copy only, which Defendants timely produced). For several months after the blank copy was produced, Plaintiff never asked that CFCS produce these supposedly very important job slips filled out by Plaintiff (which were not available in any event because they had long been discarded through regular business practice) and only later asserted they should have been produced under broad and general requests for documents—not any specific requests.

Finally, the job slips are completely irrelevant as to Plaintiff's retaliation claim based on the second termination. After Plaintiff was terminated on September 14, 2018, Plaintiff 1) went to work for another pump company, 2) flipped a boom pump truck resulting in his immediate termination from that employer on October 29, 2018 and 3) then called CFCS the next day on October 30, 2018 to ask for his job back because he was "starving." Plaintiff was terminated (the second time) after CFCS learned about Plaintiff's safety breach and dishonesty in seeking reemployment. ECF 53 (Defendants' Motion for Summary Judgment, pp. 11-13)

    **B.**     **Plaintiff fails to demonstrate (because he cannot) that Defendants engaged in bad faith**

Not surprisingly, Plaintiff fails to demonstrate that Defendants engaged in bad faith (<u>i.e.</u>, intentional destruction or tempering of the documents) in not maintaining

8

the job slips and in discarding them as a matter of regular business practice once payment is made by customers, because <u>there is no bad faith</u>. The sworn explanation by CFCS's office manager Patti Johns is uncontested:

> The "job slips" or customer invoices (CFCS 000158) are not time records or payroll records, which have all been produced. They are not used to pay Plaintiff's wages or hours worked and are used to generate billing for the client. They state the terms of the agreement by the customer/contractor such as who is providing the concrete mix and supplies. The information filled-in by the operator such as Plaintiff are limited and are filled-in for each pour at the jobsite for each customer/contractor to sign, as there can be more than one pour in a workday. All "job slips" that were filled-in by Plaintiff were discarded during the course of Plaintiff's employment pursuant to Defendant's regular business practice, as were all the other "job slips" by other employees.

ECF 92-3 (Defendant's Response to Plaintiff's Second Set of Interrogatories, No. 2, p.7) Counsel's perceived import of these documents or difficulty comprehending why a business would not keep copies of these documents once payment is made and reconciled, is not evidence. <u>See</u> <u>Bashir v. Amtrak</u>, 119 F.3d at 931-32 (11th Cir. 1997) (denying adverse inference where there is no evidence of tempering even where explanation for the destruction of material evidence was not provided).

Plaintiff suggests that Defendants engaged in bad faith because they should have known not to discard the job slips based on the February 25, 2019 letter from his attorney demanding that Defendants maintain "all documents … *potentially relevant* to the issues raised herein, including but not limited to *all computer time*

9

*records and time records*." Defendants, of course, maintained and produced all time and payroll records. The boilerplate and vague language demanding—without specifying—preservation of potentially relevant documents, did not alert Defendants to maintain the job slips as potentially relevant where the regular business practice was to discard them and where Plaintiff's claim of overtime (now moot) as made in the demand letter was solely based on alleged automatic 30-minutes meal break deduction. ECF 52-12 (February 25, 2019 letter)

Moreover, as a practical matter, even had Plaintiff sufficiently notified Defendants that the job slips are somehow potentially relevant to his claims and should be maintained, there would have been only **one (1)** such job slip—for February 26, 2019. ECF 92-3 (Defendant's Response to Plaintiff's Second Set of Interrogatories, No. 2, p. 8) (explaining under oath why Plaintiff would not have filled out a job slip for the other days he worked prior to his second termination) Plaintiff can hardly claim prejudice because one job slip was discarded after the letter as Plaintiff's second termination was wholly unrelated to any time inflating issue.

Finally, regardless of whether or not the job slips fall within FLSA's recordkeeping regulations under 29 C.F.R. § 516.6(b)[2], Plaintiff has cited—and

---

[2] While "customer orders or invoices received" may be relevant to determine or verify employee compensation in situations such as when employees are paid based on commission or sales (unlike in the instant case), the applicability of the

undersigned counsel has found—no case sanctioning (much less ordering an adverse jury instruction against) an employer for not maintaining "customer orders or invoices received" under any circumstances, much less under circumstances such as here, where employees are paid an hourly rate based on timesheets which were maintained. Whether characterized as job slips, job tickets, customer invoices or work orders, CFCS's business practice of discarding them once payment by customers is made, nowhere rises to the requisite level of bad faith needed to prove intentional destruction or tempering of evidence.

III.   Conclusion

There are no circumstances present here which would warrant an adverse jury instruction under the Eleventh Circuit precedent and any of the cases cited by Plaintiff. For these reasons, Plaintiff's motion is baseless under the facts and the law and must be denied.

---

these documents to the recordkeeping requirement where employees are paid an hourly rate based on the number of hours reported on employee timesheets which are maintained, is doubtful and in any event, makes no difference here.

WHEREFORE, Defendants respectfully request that the Court deny Plaintiff's motion for adverse jury instruction.

Respectfully submitted this 7th day of May, 2020

/s/ Paul A. Donnelly
Paul A. Donnelly, FBN 813613
paul@donnellygross.com
/s/ Jung Yoon
Jung Yoon, FBN 0599611
jung@donnellygross.com
Donnelly + Gross
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
Telephone: (352) 374-4001
Facsimile: (352) 374-4046
Counsel for Defendants

CERTIFICATE OF COMPLIANCE AS TO WORD LIMIT

I HEREBY CERTIFY that this Response including memorandum contains 2542 words.

/s/ Jung Yoon